FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 17 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| SCOTT MYLROIE, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CARTER'S, INC., MICHAEL D. CASEY, RICHARD F. WESTENBERGER, FREDERICK J. ROWAN, DAVID PULVER, CHARLES WHETZEL, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **1:09-CV-3196** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Scott Myloroie ("Plaintiff"), by his undersigned attorneys, alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents and announcements made by the Defendants, Securities and Exchange Commission ("SEC") filings, press releases, news articles, and analyst reports regarding Carter's, Inc. ("Carter's" or the "Company").

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     This is a securities class action brought on behalf of all persons who purchased the publicly traded securities of Carter's, Inc during the period between April 27, 2004 and November 10, 2009, inclusive (the "Class Period") against Carter's and certain of its officers and directors for violations of the Securities Exchange Act of 1934 ("Exchange Act").

2.     Defendant Carter's markets apparel for babies and young children through its two brand names in the children's apparel industry, Carter's and OshKosh. Carter's offers multiple product categories in this industry, including baby, sleepwear, playclothes and other accessories.

3.     During the Class Period, Defendants issued materially false and misleading statements regarding the Company's financial results and compliance with Generally Accepted Accounting Principles ("GAAP"). Specifically, the Company improperly reported margin support payments to major wholesale customers in incorrect periods, which resulted in artificially inflated prices during the Class Period for Carter's shares. Carter's shares reached a high of $34.35 per share on April 21, 2006 during the Class Period.

2

4.    On October 27, 2009, Carter's announced that it would postpone its third-quarter results, on the grounds that "it needed more time to complete a review of its accounting for discounts offered to some wholesale customers." Then, on November 10, 2009, Carter's revealed that it would be restating its consolidated financial statements for the fiscal years 2004 through 2008, and the fiscal quarters from Sept. 29, 2007 through July 4, 2009 due to the Company's failure to report certain margin support payments in the correct periods.

5.    As a result of Defendants' false statements and omissions, Carter's stock traded at artificially inflated prices during the Class Period.    After the Company revealed these accounting issues to the market, Carter's shares plunged to $21.86 per share on November 10, 2009 on unusually heavy volume, down more than 36% from the stock's Class Period high.

## JURISDICTION AND VENUE

6.    This action arises under Section 10(b) and 20(a) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.    This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3

7.      Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged fraud or the effect of the fraud occurred in this District.  In addition, many of the acts and practices made in furtherance of Defendants' scheme and complained of herein occurred in substantial part and/or had an effect in this District.  Further, Defendants were, during the Class Period, located in, or conducted substantial business within this District.

8.      In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone and Internet communications.

## **PARTIES**

9.      Plaintiff purchased shares of Carter's during the Class Period at artificially inflated prices and was damaged thereby, as reflected in the certification filed herewith.

10.      Defendant Carter's is a Delaware corporation with its principal executive offices located at 1170 Peachtree Street NE, Suite 900, Atlanta, Georgia 30309.

4

11.    Defendant Michael D. Casey ("Casey") has served as the Chief Executive Officer since August 2008 and Chairman of the Board since September 2009. He also served as the Executive Vice President and Chief Financial Officer from March 2003 to September 2009.

12.    Defendant Richard F. Westenberger ("Westenberger") has served as the Executive Vice President & Chief Financial Officer since 2009.

13.    Defendant Frederick J. Rowan ("Rowan") formerly served as the President and Chief Executive Officer since 1992 and as Chairman of the Board of Directors since October 1996 and retired on August 1, 2008.

14.    Defendant David Pulver ("Pulver") has been a director of Carter's, Inc., since January 2002.

15.    Defendant Charles Whetzel ("Whetzel") is the Executive Vice President and Chief Sourcing Officer of Carter's, Inc.

16.    Defendants Casey, Westenberger, Rowan, Pulver, and Whetzel are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of

the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

17.    Defendant Carter's markets apparel for babies and young children through its two brand names in the children's apparel industry, Carter's and OshKosh. Carter's offers multiple product categories in this industry, including baby, sleepwear, playclothes and other accessories.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

18.    On April 27, 2004, Carter's issued a press release entitled "Carter's

Reports A 49% Increase In First Quarter Earnings On 10% Growth In Revenue,"

which stated in relevant part:

> For the first quarter ended April 3, 2004, net income increased 49% to
> $10.3 million, or $0.35 per diluted share, from $6.9 million, or $0.29
> per diluted share for the first quarter ended April 5, 2003. Pro forma
> net income, further described below, increased 34% to $10.6 million,
> or $0.36 per diluted share for the first quarter of fiscal 2004 compared
> to pro forma net income of $7.9 million, or $0.27 per diluted share for
> the first quarter of fiscal 2003.

> Fred Rowan, Chairman of the Board of Directors, President and Chief
> Executive Officer of Carter's said, "We are very pleased with our
> spring product performance. We have experienced particularly strong
> selling results in sleepwear due to better creative, upgraded fabrics
> and the expansion of our sourcing initiatives. Consumer demand for
> our new *Carter's Classics* offerings has been particularly strong. We
> continue to gain market share in a highly-competitive environment,
> which further validates our strategy of focusing on core products and
> we see additional opportunity for growth by continuing this focus on
> improving our product offerings, reducing complexity and lowering
> costs."

> Pro forma results for the first quarter of fiscal 2004 exclude
> $0.3 million in after-tax restructuring charges related to the closure of
> the Company's sewing facilities in Costa Rica. Pro forma results for
> the first quarter of fiscal 2003 include $1.0 million, net of tax, to
> reflect pro forma interest savings associated with the Company's
> initial public offering and debt reduction completed in the fourth
> quarter of fiscal 2003 as if they had occurred at the beginning of fiscal
> 2003. These adjustments are set forth in the reconciliation of results in

accordance with generally accepted accounting principles (GAAP) to the pro forma results shown in the table below. The number of weighted average shares in the first quarter of fiscal 2003 has been adjusted in the pro forma earnings per share calculations to give effect to the initial public offering and to treat the incremental shares sold as if they were outstanding for the period presented. The Company believes that the pro forma information in this release provides a meaningful comparison of its operational and financial results.

Cash flow from operations was $13.4 million in the first quarter of fiscal 2004 compared to $12.3 million in the first quarter of fiscal 2003, an increase of 9%. Cash flow from operations in the first quarter of fiscal 2004 reflects the growth in earnings and a reduction in inventory, partially offset by growth in accounts receivable driven by sales of our *Child of Mine* brand and lower levels of current liabilities.

In March of 2004, the Company made a voluntary payment on its term loan of $5.0 million and an excess cash flow payment of $2.4 million, as required by its senior credit facility. Such payments resulted in an 8% reduction of its term loan during the first quarter of fiscal 2004. In the past twelve months, the Company has reduced total debt by approximately 30%.

Revenues in the first quarter of fiscal 2004 increased 10% to $182.7 million from $166.0 million for the first quarter of fiscal 2003. The increase in net sales for the first quarter of fiscal 2004 was driven by a $20.4 million increase in sales to the mass channel from $12.5 million to $32.9 million. This growth reflects sales of our *Child of Mine* brand to Wal-Mart, which launched in June of 2003 and growth in sales of the *Tykes* brand to Target stores. As expected, given the 47% growth in wholesale sales in the first quarter of fiscal 2003, wholesale sales decreased $6.0 million, or 6%, to $90.6 million from $96.6 million in the first quarter of fiscal 2003. Sales growth in the wholesale channel is expected to be 5% to 6% for fiscal 2004.

The Company's retail store sales in the first quarter of fiscal 2004 increased $2.3 million, or 4%, to $59.2 million from $56.9 million in the first quarter of fiscal 2003 due to incremental revenue from new

store openings and a comparable store sales increase of 3.7%. As of April 3, 2004, Carter's had a total of 170 retail stores, including one store opened in February 2004. We plan to open eleven stores and close five stores during the balance of fiscal 2004.

19.    On May 3, 2004, Carter's filed a Form 10-Q with the SEC for the first fiscal quarter of 2004.  This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on April 27, 2004.

20.    On July 28, 2004, Carter's issued a press release entitled "Carter's Reports A 12% Increase In Net Sales For The Second Quarter Of 2004; Net Income More Than Doubles," which stated in relevant part:

> Net sales in the second quarter of fiscal 2004 increased 12% to $156.3 million from $140.0 million for the second quarter of fiscal 2003. The increase in net sales for the second quarter of fiscal 2004 includes a $7.9 million, or 12%, increase in wholesale sales from $65.6 million to $73.5 million and a $5.0 million, or 28%, increase in sales to the mass channel from $17.8 million to $22.8 million. Growth in wholesale sales was driven by increases in all product categories, including strong sleepwear product performance. Growth in the mass channel reflects the benefit from a full three-months of sales of our *Child of Mine* brand to Wal-Mart, which launched in June of 2003, and growth in sales of the *Tykes* brand to Target stores.
>
> The Company's retail store sales in the second quarter of fiscal 2004 increased $3.4 million, or 6%, to $60.0 million from $56.6 million in the second quarter of fiscal 2003 due to incremental sales from 15 new store openings since June of 2003. Comparable store sales for the second quarter of fiscal 2004 were flat to the second quarter of fiscal 2003. As of July 3, 2004, Carter's had a total of 174 retail stores, and

we plan to open five stores and close four stores during the balance of fiscal 2004.

Fred Rowan, Chairman of the Board of Directors and Chief Executive Officer of Carter's said, "We are very pleased with our performance in the second quarter of 2004 despite a challenging retail environment. We continue to focus on product leadership in all channels of distribution. We continue to successfully demonstrate the strength of our growth initiatives, and we are on track to achieve our financial goals for 2004."

For the second quarter ended July 3, 2004, net income increased 183% to $5.9 million, or $0.20 per diluted share, from $2.1 million, or $0.09 per diluted share, for the second quarter ended July 5, 2003. Net income in the second quarter includes a benefit of $933,000, or $0.03 per diluted share, which represents the cumulative effect of a correction in the cost of inventory.

Compared to pro forma net income of $3.1 million, or $0.11 per diluted share for the second quarter ended July 5, 2003, further described below, net income for the second quarter ended July 3, 2004 increased 91% to $5.9 million, or $0.20 per diluted share. Excluding the effect of the inventory adjustment of $0.03 per diluted share described above, diluted earnings per share for the second quarter ended July 3, 2004 would have been $0.17 per diluted share, an increase of 55% as compared to pro forma diluted earnings per share of $0.11 for the second quarter ended July 5, 2003.

Net sales in the first half of fiscal 2004 increased 11% to $339.0 million from $306.0 million for the first half of fiscal 2003. In our wholesale channel, net sales increased $1.9 million, or 1%, in the first half of fiscal 2004 to $164.1 million from $162.2 million in the first half of fiscal 2003. As expected, wholesale net sales growth in the second quarter of fiscal 2004 more than offset the 6% decline in wholesale net sales experienced during the first quarter of fiscal 2004.

Net sales to the mass channel in the first half of fiscal 2004 increased $25.5 million to $55.7 million from $30.2 million in the first half of

fiscal 2003. This growth reflects sales of our *Child of Mine* brand to Wal-Mart, which launched in June of 2003, and growth in sales of the *Tykes* brand to Target stores.

The Company's retail store sales in the first half of fiscal 2004 increased $5.7 million, or 5%, to $119.2 million from $113.5 million in the first half of fiscal 2003 due to incremental sales from new store openings and a comparable store sales increase of 1.8%. During the first half of fiscal 2004, the Company opened five stores.

For the first half of fiscal 2004, net income increased 80% to $16.2 million, or $0.54 per diluted share, from $9.0 million, or $0.38 per diluted share for the first half of fiscal 2003. Pro forma net income increased 50% to $16.6 million, or $0.55 per diluted share for the first half of fiscal 2004 compared to pro forma net income of $11.0 million, or $0.38 per diluted share for the first half of fiscal 2003. Excluding the effect of the inventory adjustment of $0.03 per diluted share described above, pro forma diluted earnings per share for the first half of fiscal 2004 would have been $0.52 per diluted share, an increase of 37% as compared to pro forma diluted earnings per share of $0.38 for the first half of fiscal 2003.

Net cash used in operations was $5.4 million in the first half of fiscal 2004 compared to net cash used in operations of $21.9 million in the first half of fiscal 2003. Net cash used in operations in the first half of fiscal 2004 reflects the growth in earnings and favorable changes in working capital.

21.    On August 17, 2004, Carter's filed a Form 10-Q with the SEC for the second fiscal quarter of 2004. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on July 28, 2004.

22.    On October 26, 2004, Carter's issued a press release entitled "Carter's

Reports An 18% Increase In Net Sales For The Third Quarter Of 2004; Net Income

Increases 45%," which stated in relevant part:

> Net sales in the third quarter of fiscal 2004 increased 18% to $251.4
> million from $212.1 million in the third quarter of fiscal 2003. The
> increase in net sales for the third quarter of fiscal 2004 includes a
> $10.6 million, or 10%, increase in sales to the wholesale channel from
> $103.3 million to $113.9 million and a $19.9 million, or 64%, increase
> in sales to the mass channel from $31.3 million to $51.2 million.
>
> The Company's retail store sales in the third quarter of fiscal 2004
> increased $8.7 million, or 11%, to $86.2 million from $77.5 million in
> the third quarter of fiscal 2003 due to an increase of 6.1% in
> comparable store sales and incremental sales from 13 new store
> openings since September of 2003. As of October 2, 2004, Carter's
> had a total of 177 retail stores, including three stores opened during
> the third quarter. Carter's plans to open three stores and close four
> stores in the fourth quarter of fiscal 2004.
>
> Fred Rowan, Chairman of the Board of Directors and Chief Executive
> Officer of Carter's said, "We are very pleased with our strong
> performance in the third quarter of 2004 in all channels of
> distribution. We continue to produce great quality, essential core
> products at attractive price points that have enabled us to increase our
> market share. We are on track to achieve our 2004 financial goals and
> our growth initiatives have positioned us for continued strong
> performance in 2005."
>
> In the third quarter of fiscal 2004, net income increased 45% to $18.4
> million, or $0.62 per diluted share, from $12.7 million, or $0.52 per
> diluted share, in the third quarter of fiscal 2003. Compared to pro
> forma net income of $14.2 million, or $0.48 per diluted share in the
> third quarter of fiscal 2003, further described below, pro forma net
> income in the third quarter of fiscal 2004 increased 30%.

Net sales in the first nine months of fiscal 2004 increased 14% to $590.4 million from $518.1 million in the first nine months of fiscal 2003. In our wholesale channel, net sales increased $12.4 million, or 5%, in the first nine months of fiscal 2004 to $278.0 million from $265.6 million in the first nine months of fiscal 2003.

Net sales to the mass channel in the first nine months of fiscal 2004 increased $45.4 million to $106.9 million from $61.6 million in the first nine months of fiscal 2003. This increase reflects growth in sales of our *Child of Mine* brand to Wal-Mart, which we began shipping in June of 2003, and growth of the *Tykes* brand sold to Target.

The Company's retail store sales in the first nine months of fiscal 2004 increased $14.4 million, or 8%, to $205.4 million from $191.0 million in the first nine months of fiscal 2003 due to incremental sales from new store openings and a comparable store sales increase of 3.5%. During the first nine months of fiscal 2004, the Company opened eight stores.

For the first nine months of fiscal 2004, net income increased 60% to $34.6 million, or $1.16 per diluted share, from $21.7 million, or $0.90 per diluted share for the first nine months of fiscal 2003. Pro forma net income, further described below, increased 39% to $35.0 million, or $1.17 per diluted share for the first nine months of fiscal 2004 compared to pro forma net income of $25.2 million, or $0.86 per diluted share for the first nine months of fiscal 2003.

Net cash used in operations was $14.1 million in the first nine months of fiscal 2004 compared to net cash provided by operations of $9.4 million in the first nine months of fiscal 2003. Net cash used in operations in the first nine months of fiscal 2004 reflects growth in accounts receivable driven by the timing of wholesale and mass channel sales and the growth in inventory to support higher levels of demand.

23.    On November 12, 2004, Carter's filed a Form 10-Q with the SEC for

the third fiscal quarter of 2004.  This Form 10-Q was signed by Defendants Rowan

and Casey and reaffirmed the Company's financial results previously announced

on October 26, 2004.

24.    On February 22, 2005, Carter's issued a press release entitled

"Carter's Reports 25% Increase In Fourth Quarter Sales And Record Earnings For

The Quarter And Fiscal 2004," which stated in relevant part:

> Net sales in the fourth quarter of fiscal 2004 increased 25.3% to
> $232.7 million from $185.7 million in the fourth quarter of fiscal
> 2003.  The increase in net sales was driven by growth in all channels.
> Net income for the fourth quarter of fiscal 2004 was $15.0 million, or
> $0.50 per diluted share as compared to $1.6 million, or $0.06 per
> diluted share for the fourth quarter of fiscal 2003.  Pro forma net
> income, which includes adjustments related to certain closure costs
> and the Company's initial public offering in fiscal 2003, further
> described below, increased 37.7% to $15.0 million, or $0.50 per
> diluted share for the fourth quarter of fiscal 2004 as compared to pro
> forma net income of $10.9 million in the fourth quarter of fiscal 2003,
> or $0.37 per diluted share.
>
> Net sales for fiscal 2004 increased 16.9% to $823.1 million from
> $703.8 million for fiscal 2003.  Net income for fiscal 2004 was $49.7
> million, or $1.66 per diluted share, as compared to $23.3 million, or
> $0.92 per diluted share for fiscal 2003.  Pro forma net income
> increased 38.5% to $50.0 million, or $1.67 per diluted share for fiscal
> 2004 compared to pro forma net income of $36.1 million, or $1.22 per
> diluted share for fiscal 2003.
>
> Fred Rowan, Chairman of the Board of Directors and Chief Executive
> Officer of Carter's said, "We have achieved record results in all
> channels of distribution by strengthening the *Carter's* brand, focusing

on high-quality, essential core products and successfully building our presence in the mass channel. We have built a diversified platform for growth which supports continued market leadership in 2005."

Fourth quarter sales were driven by sales to the mass channel which increased $16.8 million, or 76.0%, from $22.2 million in the fourth quarter of fiscal 2003 to $39.0 million in the fourth quarter of fiscal 2004. This increase reflects additional floor space, productivity gains, and new store openings at both Wal-Mart and Target. Also contributing to this growth was an increase in wholesale sales of $16.5 million, or 18.0%, from $91.3 million to $107.8 million and an increase in retail store sales of $13.7 million, or 19.0%, from $72.2 million to $85.9 million. The increase in retail store sales was driven by a 13.0% increase in comparable store sales and incremental revenue from new store openings. During the fourth quarter of fiscal 2004, the Company opened three stores.

The growth in net sales in fiscal 2004 was driven by a $62.2 million, or 74.3%, increase in sales to the mass channel from $83.7 million in fiscal 2003 to $145.9 million in fiscal 2004. This growth in the mass channel was driven by a full year of sales of our *Child of Mine* brand to Wal-Mart and increased sales to Target. Our wholesale sales increased 8.1%, or $28.9 million, from $356.9 million to $385.8 million as a result of growth in all of the Company's baby, sleepwear, and playwear product categories. The Company's retail store sales for fiscal 2004 increased 10.7%, or $28.2 million, from $263.2 million to $291.4 million due to a 6.2% increase in comparable store sales and incremental revenue from new store openings. During fiscal 2004, the Company opened 11 stores and had a total of 180 retail stores at January 1, 2005.

Cash flow from operations was $42.7 million in fiscal 2004 compared to $40.5 million in fiscal 2003, an increase of 5.4%, which reflects the growth in earnings, partially offset by increased inventory levels to support forecasted demand and higher levels of accounts receivable resulting from the growth in net sales.

25.   On March 16, 2005, Carter's filed its Annual Report with the SEC on Form 10-K for the fourth quarter of 2004 and 2004 fiscal year.  This Form 10-Q was signed by, among others, Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on February 22, 2005.

26.   On April 26, 2005, Carter's issued a press release entitled "Carter's Reports A 34% Increase In First Quarter Earnings On 13% Growth In Net Sales," which stated in relevant part:

> Net sales in the first quarter of fiscal 2005 increased 13% to $206.2 million from $182.7 million in the first quarter of fiscal 2004. The increase in net sales was driven by growth in all channels, including an increase in retail comparable store sales of 8.8%. Net income for the first quarter of fiscal 2005 increased 34% to $13.8 million, or $0.46 per diluted share, from $10.3 million, or $0.35 per diluted share, in the first quarter of fiscal 2004.
>
> Fred Rowan, Chairman of the Board of Directors and Chief Executive Officer of Carter's said, "We achieved record first quarter sales and earnings.  In our wholesale segment, we are pleased with our spring product performance, especially in our playwear product category. Our retail segment has exceeded our expectations with growth driven by great core product and our new retail leadership team. In the mass channel, we have expanded our *Child of Mine* product offering to include newborn playwear and are very encouraged by the sell-throughs. We believe our diversified platform for growth will enable us to achieve our objectives for fiscal 2005."
>
> First quarter net sales were led by an increase in retail store sales of $8.5 million, or 14%, to $67.8 million in the first quarter of fiscal 2005 from $59.2 million in the first quarter of fiscal 2004. This increase in retail store sales was driven by a comparable store sales increase of 8.8% and incremental revenue from eleven store openings

since the first quarter of fiscal 2004. Also contributing to this growth was an increase in mass channel sales of $6.6 million, or 20%, to $39.5 million in the first quarter of fiscal 2005 from $32.9 million in the first quarter of fiscal 2004 driven by growth in sales of our *Child of Mine* brand to Wal-Mart, including our new playwear product line. Wholesale sales, excluding off-price sales, increased $5.6 million, or 6%, to $92.2 million in the first quarter of fiscal 2005 from $86.7 million in the first quarter of fiscal 2004 driven by our playwear and sleepwear product categories.

Cash flow from operations was $24.6 million in the first quarter of fiscal 2005 as compared to $13.4 million in the first quarter of fiscal 2004. Growth in cash flow from operations in the first quarter of fiscal 2005 reflects the growth in earnings and a reduction in accounts receivable, partially offset by decreases in accounts payable and other liabilities. In March of 2005, the Company made a voluntary payment of $20 million on its term loan. Since the end of the first quarter of fiscal 2004, the Company has reduced long-term debt by approximately 20%.

27.     On April 28, 2005, Carter's filed a Form 10-Q with the SEC for the first fiscal quarter of 2005. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on April 26, 2005.

28.     On July 26, 2005, Carter's issued a press release entitled "Carter's Reports a 23% Increase in Second Quarter Sales Driven by Growth in All Channels," which stated in relevant part:

Net sales in the second quarter of fiscal 2005 increased $36.2 million, or 23%, to $192.5 million from $156.3 million in the second

17

quarter of fiscal 2004. The increase in net sales for the second quarter of fiscal 2005 includes a $12.5 million, or 17%, increase in sales in the wholesale channel from $73.5 million to $86.0 million and a $16.2 million, or 71%, increase in sales in the mass channel from $22.8 million to $39.0 million.

The Company's retail store sales in the second quarter of fiscal 2005 increased $7.5 million, or 13%, to $67.5 million from $60.0 million in the second quarter of fiscal 2004 due to an increase of 7.1% in comparable store sales and incremental sales from 11 new store openings since July 3, 2004. As of July 2, 2005, Carter's had a total of 185 retail stores, including four stores opened during the second quarter of fiscal 2005.

Net income in the second quarter of fiscal 2005 decreased $0.5 million to $5.5 million, or $0.18 per diluted share, from $5.9 million, or $0.20 per diluted share, in the second quarter of fiscal 2004. This decrease was driven by after-tax charges of $3.3 million associated with the closure of two sewing facilities in Mexico. Excluding these charges, pro forma net income in the second quarter of fiscal 2005 increased 48% to $8.8 million, or $0.29 per diluted share.

Fred Rowan, Chairman of the Board of Directors and Chief Executive Officer of Carter's said, "We continue to experience strong results in all channels of distribution because of our focus on essential core products and superior execution. We are very excited about the acquisition of OshKosh B'Gosh, Inc. This acquisition brings together two of America's most trusted children's apparel brands with annual sales of approximately $1.3 billion. There is tremendous potential to be realized by leveraging our proven brand management and supply chain skills which we believe will result in significant long-term value for our shareholders, customers, and consumers."

Net sales in the first six months of fiscal 2005 increased 18%, or $59.7 million, to $398.7 million from $339.0 million in the first six months of fiscal 2004. In our wholesale channel, net sales increased $20.9 million, or 13%, in the first six months of fiscal 2005 to $185.0 million from $164.1 million in the first six months of fiscal 2004.

Net sales to the mass channel in the first six months of fiscal 2005 increased $22.7 million, or 41%, to $78.4 million from $55.7 million in the first six months of fiscal 2004. This increase reflects growth in sales of our Child of Mine brand to Wal-Mart, including our newborn playwear product category, and increased sales of our Just One Year brand to Target.

The Company's retail store sales in the first six months of fiscal 2005 increased $16.0 million, or 13%, to $135.3 million from $119.2 million in the first six months of fiscal 2004 due to incremental sales from new store openings and a comparable store sales increase of 7.9%. During the first six months of fiscal 2005, the Company opened five stores.

For the first six months of fiscal 2005, net income increased 19%, or $3.1 million, to $19.3 million, or $0.64 per diluted share, from $16.2 million, or $0.54 per diluted share, for the first six months of fiscal 2004. Excluding charges related to plant closures in Mexico in fiscal 2005 and facility closings in fiscal 2004, pro forma net income increased 37% to $22.6 million, or $0.75 per diluted share, for the first six months of fiscal 2005 as compared to pro forma net income of $16.6 million, or $0.55 per diluted share, for the first six months of fiscal 2004.

Net cash provided by operating activities for the first half of fiscal 2005 was $22.6 million compared to net cash used in operating activities of $5.4 million in the first half of fiscal 2004. The improvement in cash flow from operations is primarily attributable to the growth in earnings and improvement in working capital.

29.     On August 10, 2005, Carter's filed a Form 10-Q with the SEC for the second fiscal quarter of 2005. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on July 26, 2005.

30.    On February 21, 2006, Carter's issued a press release entitled "Carter's, Inc. Reports Fourth Quarter and Fiscal 2005 Results," which stated in relevant part:

Net sales increased 50.6% to $350.5 million. This increase reflects growth in all channels of distribution and includes $103.7 million in net sales from OshKosh. Excluding OshKosh, net sales increased 6.1% to $246.8 million.

Retail store sales increased 98.0% to $170.2 million. Excluding OshKosh retail store sales of $76.6 million, retail store sales increased 8.9% to $93.6 million. This increase was driven by a 6.1% increase in comparable store sales and new store openings.

The Company's wholesale sales increased 28.4% to $138.3 million. Excluding OshKosh wholesale sales of $27.0 million, wholesale sales increased 3.2% to $111.3 million. Mass channel sales increased 7.6% to $42.0 million.

Net income increased 15.4% to $17.3 million, or $0.57 per diluted share, including charges related to the Acquisition and plant closure costs. Excluding these charges, adjusted net income increased 37.5% to $20.7 million, or $0.68 per diluted share. The reconciliation of income, as reported under generally accepted accounting principles ("GAAP"), to income adjusted for these charges is shown below.

Fred Rowan, Chairman and CEO, noted that, "Our results continue to reflect the strength of our diversified platform for growth. We grew in all of our channels of distribution in the fourth quarter, including a 6.1% comparable store sales increase in our Carter's retail stores. We have made significant progress in the initial phases of the OshKosh integration. With OshKosh, we reached over $1 billion in sales in fiscal 2005 and created significant synergies and organic growth opportunities, which we believe will enable us to sustain our long-term growth objectives."

Fiscal 2005 Compared to Fiscal 2004

Net sales increased 36.2% to $1.1 billion, including $199.8 million in net sales from OshKosh. Excluding OshKosh, net sales increased 12.0% to $921.5 million.

Retail store sales increased 56.7% to $456.6 million. Excluding OshKosh retail store sales of $140.1 million, retail store sales increased 8.6% to $316.5 million. This increase was driven by a 4.8% increase in comparable store sales and 17 new store openings. As of December 31, 2005, the Company had 193 Carter's retail stores and 142 OshKosh retail stores.

The Company's wholesale sales increased 26.2% to $486.8 million. Excluding OshKosh wholesale sales of $59.7 million, wholesale sales increased 10.7% to $427.0 million. Net sales to the mass channel increased 22.0% to $178.0 million.

Net income decreased 4.9% to $47.2 million, or $1.55 per diluted share, including charges related to the Refinancing, charges related to the Acquisition, and plant closure costs. Excluding these charges, adjusted net income increased 48.5% to $74.3 million, or $2.45 per diluted share

...

Net cash provided by operations was $137.3 million in fiscal 2005 compared to net cash provided by operations of $42.7 million in fiscal 2004. Net cash provided by operations reflects the increase in earnings, adjusted for non- cash charges and Refinancing charges, and favorable changes in working capital. Additionally, since the Acquisition, the Company has paid down $70 million of its new $500 million term loan.

31.    On March 15, 2006, Carter's filed its Annual Report with the SEC on

Form 10-K for the fourth fiscal quarter of 2005 and the 2005 fiscal year. This

Form 10-K was signed by, among others, Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on February 21, 2006.

32.   On April 25, 2006, Carter's issued a press release entitled "Carter's, Inc. Reports First Quarter Results," which stated in relevant part:

> Net sales increased 43.8% to $296.4 million.  Excluding OshKosh sales of $71.0 million, net sales increased 9.3% to $225.4 million.
>
> The Company's wholesale sales increased 32.4% to $131.0 million. Excluding OshKosh wholesale sales of $28.7 million, wholesale sales increased 3.4% to $102.3 million.   The Company's mass channel sales, which are comprised of sales of our *Child of Mine* and *Just One Year* brands, increased 36.8% to $54.0 million.  Our *Genuine Kids from OshKosh* brand is sold at Target under a licensing arrangement, the income from which is included in royalty income and has no impact on mass channel sales.
>
> Retail store sales increased 64.4% to $111.4 million.  Excluding OshKosh retail store sales of $42.3 million, retail store sales increased 1.9% to $69.1 million.  This increase was driven by new store openings, partially offset by a comparable store sales decline of 2.2%.
>
> In the first quarter of fiscal 2006, the Company opened seven Carter's retail stores and one OshKosh retail store.  The Company closed one Carter's retail store and one OshKosh retail store during the first quarter of fiscal 2006.  As of April 1, 2006, the Company had 199 Carter's retail stores and 142 OshKosh retail stores.
>
> Net income increased 14.0% to $15.8 million, or $0.52 per diluted share, including non-cash charges of $0.02 per diluted share of intangible amortization related to the Acquisition and $0.02 per

22

diluted share related to stock-based compensation resulting from the adoption of Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"). Excluding these charges, adjusted net income increased 23.7% to $17.1 million, or $0.56 per diluted share. The reconciliation of income, as reported under generally accepted accounting principles ("GAAP"), to income adjusted for these charges is shown below.

Fred Rowan, Chairman and CEO, noted that, "We are off to a strong start and we are on track to achieve our growth objectives for 2006. We had a good quarter in terms of growth in sales and earnings and we continue to make significant progress integrating and improving the OshKosh business. Our first quarter performance reflects the strength of our brand and channel diversification. Excluding the benefit of OshKosh, the growth in our wholesale and mass channel segments more than offset the impact of the comparable store sales decline in our Carter's brand retail store segment during the quarter. We continue to believe that our balanced platform for growth, strengthened by the addition of OshKosh, will enable us to achieve our long-term growth objectives."

...

Net cash used in operations was $14.0 million in the first quarter of fiscal 2006 as compared to net cash provided by operations of $24.6 million in the first quarter of fiscal 2005. The change in cash flow was driven by significant reductions in accounts payable and accrued liabilities and increases in accounts receivable, partially offset by the reduction in inventories. Such changes in working capital were driven by timing of payments to vendors and shipments to customers, in addition to the impact of the Acquisition. In March 2006, the Company made a voluntary payment of $9.0 million on its term loan. Since the Acquisition and Refinancing, the Company has reduced its long-term debt by approximately $80.0 million, or 16%.

33.    On May 11, 2006, Carter's filed a Form 10-Q with the SEC for the first fiscal quarter of 2005. This Form 10-Q was signed by Defendants Rowan and

Casey and reaffirmed the Company's financial results previously announced on April 25, 2006.

34.    On July 25, 2006, Carter's issued a press release entitled "Carter's, Inc. Reports Second Quarter Results," which stated in relevant part:

> Net sales increased 44.2% to $277.6 million. Excluding OshKosh sales of $71.1 million, net sales increased 7.3% to $206.5 million.
>
> The Company's wholesale sales increased 21.5% to $104.5 million. Excluding OshKosh sales of $20.4 million and Carter's off-price sales of $8.1 million in 2006 and $11.8 million in 2005, wholesale sales increased 2.4% to $76.0 million.
>
> The Company's mass channel sales, which are comprised of sales of its Child of Mine brand to Wal-Mart and Just One Year brand to Target, increased 30.8% to $51.0 million. The Genuine Kids from OshKosh brand is sold at Target under a licensing arrangement, the income from which is included in royalty income and has no impact on mass channel sales.
>
> Retail store sales increased 80.9% to $122.1 million. Excluding OshKosh retail store sales of $50.7 million, retail store sales increased 5.8% to $71.4 million. This increase was driven by sales from new stores and a comparable store sales increase of 1.8%.
>
> In the second quarter of fiscal 2006, the Company opened four Carter's retail stores and one OshKosh retail store. The Company closed three Carter's retail stores during the second quarter of fiscal 2006. As of July 1, 2006, the Company had 200 Carter's retail stores and 143 OshKosh retail stores.
>
> In the second quarter of fiscal 2006, net income increased 65.5% to $9.0 million, or $0.15 per diluted share, including non-cash

charges of $0.01 per diluted share of intangible amortization resulting from the Acquisition and $0.01 per diluted share related to stock-based compensation resulting from the adoption of Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"). Net income of $5.5 million, or $0.09 per diluted share, for the second quarter of fiscal 2005 included charges of $0.05 per diluted share associated with the closure of two sewing facilities in Mexico. Excluding these charges in each period, adjusted net income increased 18.2% to $10.4 million. Diluted earnings per share, excluding these charges in each period, increased 21.4% to $0.17 per diluted share. The reconciliation of income, as reported under generally accepted accounting principles ("GAAP"), to income adjusted for these charges is shown below

. . . .

Fred Rowan, Chairman and CEO, noted that, "We are on track to achieve our consolidated sales and earnings goals for 2006. Our mass channel business continues to exceed our expectations and helped offset lower than expected comparable store sales growth in our Carter's retail stores. We expect the Carter's brand wholesale business in the second half of 2006 to be strong based on the launch of our new Carter's Starters products and favorable customer reaction to our Spring 2007 product lines, which begin shipping in the fourth quarter. We are pleased with the progress of the OshKosh integration, and we expect OshKosh to contribute meaningfully to our second half results."

First half 2006 compared to first half 2005

Net sales increased 44.0% to $574.0 million. Excluding OshKosh sales of $142.1 million, net sales increased 8.3% to $431.9 million.

The Company's wholesale sales increased 27.3% to $235.5 million. Excluding OshKosh sales of $49.0 million and Carter's off-price sales of $13.8 million in 2006 and $18.5 million in 2005,

wholesale sales increased 3.7% to $172.7 million. The Company's mass channel sales increased 33.8% to $105.0 million.

Retail store sales increased 72.6% to $233.5 million. Excluding OshKosh retail store sales of $93.0 million, retail store sales increased 3.8% to $140.5 million. This increase was driven by sales from new stores, offset by a comparable store sales decline of 0.2%.

In the first half of fiscal 2006, the Company opened eleven Carter's retail stores and two OshKosh retail stores. The Company closed four Carter's retail stores and one OshKosh retail store during the first half of fiscal 2006. In fiscal 2006, the Company plans to open 30 Carter's and 14 OshKosh retail stores and plans to close six Carter's and three OshKosh retail stores.

In the first half of fiscal 2006, net income increased 28.5% to $24.8 million, or $0.41 per diluted share, including non-cash charges of $0.02 per diluted share of intangible amortization resulting from the Acquisition and $0.02 per diluted share related to stock-based compensation resulting from the adoption of SFAS 123R. Net income of $19.3 million, or $0.32 per diluted share, for the first half of fiscal 2005 included charges of $0.05 per diluted share associated with the closure of two sewing facilities in Mexico. Excluding these charges in both periods, adjusted net income increased 21.6% to $27.5 million. Diluted earnings per share, excluding these charges in each period, increased 21.6% to $0.45 per diluted share. The reconciliation of income, as reported under GAAP, to income adjusted for these charges is shown below

. . . .

Net cash used in operations was $2.7 million in the first half of fiscal 2006 as compared to net cash provided by operations of $22.6 million in the first half of fiscal 2005. The change in cash flow was driven by significant reductions in accounts payable and other current liabilities and increases in accounts receivable and inventory levels. Such changes in working capital were driven by timing of payments to vendors and shipments to customers and the payment of

Acquisition-related liabilities, including severance and lease termination costs. In the first half of fiscal 2006, the Company made payments of $36 million on its term loan, including prepayments of $34 million. Since the Acquisition, the Company has reduced its long-term debt by $106.1 million, or 21.2%.

35.    On August 9, 2006, Carter's filed a Form 10-Q with the SEC for the second fiscal quarter of 2005. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on July 25, 2006.

36.    On October 24, 2006, Carter's issued a press release entitled "Carter's, Inc. Reports Third Quarter Results," which stated in relevant part:

> Net sales increased 5.3% to $392.0 million. Excluding OshKosh sales of $88.5 million in 2006 and $96.1 million in 2005, net sales increased 9.9% to $303.5 million.

> The Company's wholesale sales increased 3.7% to $169.4 million. Excluding OshKosh wholesale sales of $25.8 million in 2006 and $32.6 million in 2005 and Carter's off-price sales of $9.0 million in 2006 and $6.9 million in 2005, Carter's wholesale sales increased 8.7% to $134.6 million.

> The Company's mass channel sales, which are comprised of sales of its Child of Mine brand to Wal-Mart and Just One Year brand to Target, increased 15.2% to $66.3 million.

> Retail store sales increased 3.4% to $156.2 million. Excluding OshKosh retail store sales of $62.7 million in 2006 and $63.5 million in 2005, Carter's retail store sales increased 6.6% to $93.5 million. This increase was driven by sales from new Carter's stores opened

since the third quarter of fiscal 2005 and a comparable store sales increase of 1.7%.

In the third quarter of fiscal 2006, the Company opened five Carter's stores and four OshKosh stores. The Company also closed one OshKosh store. As of September 30, 2006, the Company had 205 Carter's stores and 146 OshKosh stores.

In the third quarter of fiscal 2006, net income increased $24.4 million to $35.0 million, or $0.57 per diluted share, including non-cash charges of $0.01 per diluted share of intangible amortization resulting from the Acquisition and $0.01 per diluted share related to stock-based compensation resulting from the adoption of Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"). Net income of $10.6 million, or $0.17 per diluted share, for the third quarter of fiscal 2005 included charges of $19.1 million, or $0.32 per diluted share, associated with the Acquisition and Refinancing, and $1.3 million, or $0.02 per diluted share, of costs associated with the closure of two sewing facilities in Mexico. Excluding these charges in each period, adjusted net income increased 17.1% to $36.3 million. Diluted earnings per share, excluding these charges in each period, increased 15.7% to $0.59 per diluted share. The reconciliation of income, as reported under generally accepted accounting principles ("GAAP"), to income adjusted for these charges is shown below.

. . .

"We are very pleased with the strong performance of our wholesale and mass channel segments which continue to offset lower than expected results from Carter's and OshKosh's retail stores" noted Fred Rowan, Chairman and CEO. "We are committed to improving our retail store performance, building Carter's and OshKosh's brand equity, and elevating product design under each brand's umbrella. We are encouraged by the response from our customers to our spring and summer 2007 products, which reflect the benefit from investments we have made in talent and branding this past year."

First nine months of fiscal 2006 compared to first nine months of fiscal 2005

Net sales increased 25.3% to $966.0 million. Excluding OshKosh sales of $230.6 million in 2006 and $96.1 million in 2005, net sales increased 9.0% to $735.4 million.

The Company's wholesale sales increased 16.2% to $405.0 million. Excluding OshKosh wholesale sales of $74.9 million in 2006 and $32.6 million in 2005 and Carter's off-price sales of $22.8 million in 2006 and $25.5 million in 2005, Carter's wholesale sales increased 5.8% to $307.3 million.

The Company's mass channel sales increased 25.9% to $171.3 million.

Retail store sales increased 36.1% to $389.7 million. Excluding OshKosh retail store sales of $155.8 million in 2006 and $63.5 million in 2005, Carter's retail store sales increased 4.9% to $234.0 million. This increase was driven by sales from new Carter's stores opened since the third quarter of fiscal 2005 and a comparable store sales increase of 0.6%.

In the first nine months of fiscal 2006, the Company opened 16 Carter's stores and six OshKosh stores. The Company also closed four Carter's stores and two OshKosh stores. In fiscal 2006, the Company plans to open 30 Carter's and 15 OshKosh stores and plans to close eight Carter's and three OshKosh stores.

In the first nine months of fiscal 2006, net income increased $29.9 million to $59.8 million, or $0.98 per diluted share, including non-cash charges of $0.03 per diluted share of intangible amortization resulting from the Acquisition and $0.03 per diluted share related to stock-based compensation resulting from the adoption of SFAS 123R. Net income of $29.9 million, or $0.49 per diluted share, for the first nine months of fiscal 2005 included charges of $19.1 million, or $0.31 per diluted share, associated with the Acquisition and Refinancing, and $4.6 million, or $0.08 per diluted share, of costs

associated with the closure of two sewing facilities in Mexico. Excluding these charges in each period, adjusted net income increased 19.0% to $63.8 million. Diluted earnings per share, excluding these charges in each period, increased 18.2% to $1.04 per diluted share. The reconciliation of income, as reported under GAAP, to income adjusted for these charges is shown below.

. . .

Net cash used in operations was $5.2 million in the first nine months of fiscal 2006 compared to net cash provided by operations of $34.2 million in the first nine months of fiscal 2005. The change in cash flow was driven by increases in accounts receivable resulting from the timing of shipments and reductions in accounts payable and other current liabilities. In the first nine months of fiscal 2006, the Company made payments of $37.1 million on its term loan, including prepayments of $34.0 million. Since the Acquisition, the Company has reduced its long-term debt by $107.1 million, or 21.4%.

37.    On November 9, 2006, Carter's filed a Form 10-Q with the SEC for the third fiscal quarter of 2005. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on October 24, 2006.

38.    On February 20, 2007, Carter's issued a press release entitled "Carter's Reports Fourth Quarter and Fiscal 2006 Results and Announces a Stock Repurchase Program," which stated in relevant part:

Consolidated net sales increased 7.7% to $377.5 million. Net sales of the Company's Carter's brands increased 14.5% to $282.7 million. Net sales of the Company's OshKosh brand decreased 8.5% to $94.8 million.

The Company's wholesale sales increased 12.8% to $156.0 million. Carter's wholesale sales, excluding off-price sales of $9.6 million in 2006 and $7.0 million in 2005, increased 19.9% to $125.0 million. OshKosh wholesale sales, excluding off-price sales of $1.6 million in 2006 and $6.5 million in 2005, decreased 3.4% to $19.8 million.

The Company's mass channel sales, which are comprised of sales of its Child of Mine brand to Wal-Mart and Just One Year brand to Target, increased 16.7% to $49.0 million.

Retail store sales increased 1.3% to $172.4 million. Carter's retail store sales increased 5.9% to $99.1 million. This increase was driven by sales from new Carter's stores opened in fiscal 2006, partially offset by a comparable store sales decrease of 1.6%. OshKosh retail store sales decreased 4.2% to $73.3 million due to a comparable store sales decrease of 6.7%, partially offset by sales from new store openings.

In the fourth quarter of fiscal 2006, the Company opened 15 Carter's retail stores and 11 OshKosh retail stores. The Company also closed one Carter's retail store. As of December 30, 2006, the Company had 219 Carter's retail stores and 157 OshKosh retail stores.

In the fourth quarter of fiscal 2006, net income increased $10.1 million to $27.4 million, or $0.45 per diluted share, including non-cash charges of $0.01 per diluted share of intangible amortization resulting from the acquisition of OshKosh B'Gosh, Inc. (the "Acquisition"), and $0.01 per diluted share related to stock-based compensation resulting from the adoption of Statement of Financial Accounting Standards No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"). Fourth quarter fiscal 2005 net income of $17.3 million, or $0.28 per diluted share, included charges of $0.05 per diluted share associated with the Acquisition and $0.01 per diluted share of costs associated with the closure of two sewing facilities in Mexico. Excluding these charges in each period, adjusted net income increased 39.7% to $28.8 million, and adjusted diluted earnings per

share increased 38.2% to $0.47. The reconciliation of income as reported under generally accepted accounting principles ("GAAP") to income adjusted for these charges is shown below.

...

Fiscal 2006 compared to Fiscal 2005

Net sales increased 19.8% to $1.3 billion. Results for fiscal 2006 include the operations of OshKosh for the entire year and are not comparable to results for fiscal 2005, which include the operations of OshKosh from the Acquisition date of July 14, 2005 through December 31, 2005. Excluding OshKosh sales of $325.5 million in 2006 and $199.8 million in 2005, Carter's net sales increased 10.5% to $1.0 billion.

The Company's wholesale sales increased 15.3% to $561.0 million. Carter's wholesale sales, excluding off-price sales of $32.4 million in 2006 and $32.5 million in 2005, increased 9.5% to $432.2 million. OshKosh wholesale sales, excluding off-price sales of $7.6 million in 2006 and $10.5 million in 2005, were $88.8 million in 2006 and $49.2 million in 2005 for the period following the Acquisition.

The Company's mass channel sales increased 23.8% to $220.3 million.

Retail store sales increased 23.1% to $562.2 million. Carter's retail store sales increased 5.2% to $333.1 million, driven by sales from new Carter's retail stores opened in fiscal 2006, partially offset by store closures and a comparable store sales decrease of 0.1%. OshKosh retail store sales were $229.1 million in fiscal 2006 and $140.1 million in 2005 for the period following the Acquisition. In fiscal 2006, the Company opened 31 Carter's retail stores and 17 OshKosh retail stores. The Company also closed five Carter's retail stores and two OshKosh retail stores.

In fiscal 2006, net income increased $40.0 million to $87.2 million, or $1.42 per diluted share, including non-cash charges of

$0.05 per diluted share of intangible amortization resulting from the Acquisition, and $0.04 per diluted share related to stock-based compensation resulting from the adoption of SFAS 123R. Fiscal 2005 net income of $47.2 million, or $0.78 per diluted share, included charges of $0.36 per diluted share associated with the Acquisition and refinancing of the Company's former senior credit facility and the repurchase of all of its 10.875% Senior Subordinated Notes due 2011 (the "Refinancing") and $0.08 per diluted share of costs associated with the closure of two sewing facilities in Mexico. Excluding these charges in each period, adjusted net income increased 24.7% to $92.7 million, and adjusted diluted earnings per share increased 23.8% to $1.51. The reconciliation of income, as reported under GAAP, to income adjusted for these charges is shown below.

. . .

Net cash provided by operating activities during fiscal 2006 was $88.2 million compared to $137.3 million in fiscal 2005. Operating cash flow in fiscal 2006 is not comparable to fiscal 2005 as a result of the timing of the Acquisition on July 14, 2005, a point in the year when OshKosh's working capital was at its peak. Additionally, in fiscal 2006, the Company had significant reductions in current liabilities resulting from the payment of Acquisition-related liabilities and a change in classification of the income tax benefit from the exercise of stock options resulting from the adoption of SFAS 123R. In fiscal 2006, the Company made payments of $85.0 million on its term loan, including prepayments of $80.9 million. From the Acquisition date through December 30, 2006, the Company has reduced its long-term debt by approximately $155.0 million, or 31.0%.

39.    On February 28, 2007, Carter's filed its Annual Report with the SEC on Form 10-K for the fourth fiscal quarter of 2006 and the 2006 fiscal year. This Form 10-K was signed by, among others, Defendants Rowan and Casey and

reaffirmed the Company's financial results previously announced on February 20, 2007.

40.    On April 24, 2007, Carter's issued a press release entitled "Carter's, Inc. Reports First Quarter Results," which stated in relevant part:

> Consolidated net sales increased 8.0% to $320.1 million. Net sales of the Company's Carter's brands increased 10.6% to $249.3 million. Net sales of the Company's OshKosh brand decreased 0.2% to $70.8 million.
>
> The Company's wholesale sales increased 5.0% to $137.6 million. Carter's wholesale sales, excluding off-price sales of $5.7 million in each of the first quarters of fiscal 2007 and 2006, increased 10.7% to $107.0 million. OshKosh wholesale sales, excluding off-price sales of $0.9 million in the first quarter of fiscal 2007 and $2.6 million in the first quarter of fiscal 2006, decreased 7.9% to $24.0 million.
>
> The Company's mass channel sales, which are comprised of sales of its Child of Mine brand to Wal-Mart and Just One Year brand to Target, increased 14.4% to $61.8 million.
>
> Total retail store sales increased 8.3% to $120.7 million. Carter's retail store sales increased 8.3% to $74.8 million driven by sales of $6.7 million from new Carter's stores opened since the first quarter of fiscal 2006 and a comparable store sales increase of $0.4 million, or 0.7%, offset by the impact of store closures of $1.4 million. OshKosh retail store sales increased 8.4% to $45.9 million driven by sales of $3.5 million from new OshKosh stores opened since the first quarter of fiscal 2006 and a comparable store sales increase of $0.3 million, or 0.8%, offset by the impact of store closures of $0.3 million.
>
> In the first quarter of fiscal 2007, the Company opened one Carter's retail store. As of March 31, 2007, the Company had 220 Carter's and 157 OshKosh retail stores. The Company plans to open ten Carter's and five OshKosh retail stores during fiscal 2007. The Company also

plans to close six Carter's and three OshKosh retail stores during fiscal 2007.

...

"Our first quarter consolidated sales and earnings were better than planned," noted Fred Rowan, Chairman and CEO. "We continue to realize strong sales growth in our Carter's wholesale and mass channel businesses, and I'm pleased with the progress we're making to improve the performance of our Retail and OshKosh wholesale segments. We're on track to realize the benefits from our product sourcing initiatives, and we expect our operating margins will improve in the second half of this year." Net cash provided by operating activities during the first quarter of fiscal 2007 was $6.7 million compared to net cash used in operating activities of $14.0 million in the first quarter of fiscal 2006. Net cash flow from operations in the first quarter of fiscal 2006 was impacted by significant reductions in accounts payable and accrued liabilities as a result of the payment of acquisition-related liabilities, the payment of increased levels of incentive compensation, and the timing of payments to vendors. In February 2007, the Company's Board of Directors authorized a $100 million share repurchase program. During the first quarter of fiscal 2007, the Company repurchased 1,252,832 shares of its common stock for approximately $30 million at an average price of $23.95 per share.

41.    On May 10, 2007, Carter's filed a Form 10-Q with the SEC for the first fiscal quarter of 2007. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on April 24, 2007.

42.    On July 24, 2007, Carter's issued a press release entitled "Carter's, Inc. Reports Second Quarter Results," which stated in relevant part:

Consolidated net sales increased 3.7% to $287.8 million. Net sales of the Company's Carter's brands increased 10.8% to $228.7 million. Net sales of the Company's OshKosh brand decreased 16.9% to $59.1 million.

The Company's wholesale sales decreased 0.9% to $103.5 million. Carter's wholesale sales, excluding off-price sales of $7.9 million in the second quarter of fiscal 2007 and $8.1 million in the second quarter of fiscal 2006, increased 12.4% to $85.4 million. OshKosh wholesale sales, excluding off-price sales of $0.3 million in the second quarter of fiscal 2007 and $2.3 million in the second quarter of fiscal 2006, decreased 45.3% to $9.9 million.

The Company's mass channel sales, which are comprised of sales of its *Child of Mine* brand to Wal-Mart and *Just One Year* brand to Target, increased 15.9% to $59.1 million. Total retail store sales increased 2.5% to $125.2 million. Carter's retail store sales increased 6.8% to $76.3 million, driven by sales of $5.3 million from Carter's stores opened since the second quarter of fiscal 2006 and a comparable store sales increase of $0.5 million, or 0.8%, partially offset by the impact of store closures of $0.9 million. OshKosh retail store sales decreased 3.6% to $48.9 million due to a comparable store sales decrease of $4.8 million, or 9.7%, and the impact of store closures of $0.3 million, partially offset by increased sales of $3.3 million from OshKosh stores opened since the second quarter of fiscal 2006.

In the second quarter of fiscal 2007, the Company opened one Carter's retail store and two OshKosh retail stores. As of June 30, 2007, the Company had 221 Carter's and 159 OshKosh retail stores. The Company plans to open a total of ten Carter's and eight OshKosh retail stores during fiscal 2007. The Company also plans to close six Carter's and three OshKosh retail stores during fiscal 2007.

As noted in our press release filed February 21, 2007, the Company announced its plans to close its distribution facility located in White House, Tennessee, which ceased operations on April 5, 2007. During

the second quarter of fiscal 2007, the Company recorded total pre-tax charges of approximately $1.1 million, or $0.01 per diluted share, related to this closure. These charges include accelerated depreciation of $0.6 million.

Under generally accepted accounting principles ("GAAP"), the Company is required to review the carrying value of its intangible assets on an annual basis, or more frequently if events or circumstances indicate that a decrease in their values may be warranted. Due to the continued negative trends in sales and profitability of the Company's OshKosh wholesale and retail segments and the current outlook for such segments for the balance of the year, the Company conducted an interim review of the value of the intangible assets that the Company recorded in connection with the acquisition of OshKosh B'Gosh, Inc. As a result of this analysis, the Tradename was adjusted from $102 million to $90 million and the Cost in Excess of Fair Value of Net Assets Acquired of $142.9 million was written off.

In the second quarter of fiscal 2007, the Company's net loss was $143.4 million, or $2.48 per diluted share, compared to net income of $9.0 million, or $0.15 per diluted share, in the second quarter of fiscal 2006. Excluding the charges related to the impairment of OshKosh intangible assets and costs related to the closure of the White House, Tennessee distribution facility, adjusted second quarter net income decreased 14.6% to $7.7 million, and adjusted diluted earnings per share decreased 13.3% to $0.13. The reconciliation of the loss as reported under GAAP to income adjusted for the impairment charges and closure costs is shown below.

...

"The strength of our Carter's wholesale and mass channel segments offset lower than expected performance from our OshKosh segments in the second quarter," noted Fred Rowan, Chairman and CEO. "We expect Carter's wholesale and mass channel business segments will continue to deliver solid growth in sales and earnings based on the strength of their essential core product marketing strategy and strong

leadership. The performance of our OshKosh segments has continued to be disappointing, and, as a result, we have revised our outlook for the year."

Mr. Rowan added, "We have made significant changes that we believe will improve OshKosh's performance beginning in fiscal 2008, including hiring a new leader of our retail segments and placing our President, Joe Pacifico, directly in charge of OshKosh's merchandising and design functions. We have also made significant changes in OshKosh's product strategies which we believe will improve OshKosh's performance beginning with our Spring 2008 product line, particularly for our wholesale customers. We are committed to improving the performance of OshKosh, which we continue to believe can meaningfully contribute to our long-term growth objectives. As a Company, we are making key investments in branding, consumer research, talent, and product competitiveness. We are convinced these steps will enable us to return to a sustainable, high-growth model."

…

43.    On August 9, 2007, Carter's filed a Form 10-Q with the SEC for the second fiscal quarter of 2007. This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on July 24, 2007.

44.    On October 23, 2007, Carter's issued a press release entitled "Carter's, Inc. Reports 5% Growth In Third Quarter Sales," which stated in relevant part:

Consolidated net sales increased 4.8% to approximately $410.9 million. Net sales of the Company's *Carter's* brands increased 5.4% to $320.0 million. Net sales of the Company's *OshKosh* brand increased 2.8% to $91.0 million.

38

The Company's wholesale sales increased 5.1% to $178.1 million. Carter's wholesale sales, excluding off-price sales of $6.0 million in the third quarter of fiscal 2007 and $9.0 million in the third quarter of fiscal 2006, increased 6.9% to $144.0 million. OshKosh wholesale sales, excluding off-price sales of $1.0 million in each of the third quarters of fiscal 2007 and 2006, increased 9.9% to $27.2 million.

The Company's mass channel sales, which are comprised of sales of its *Child of Mine* brand to Wal-Mart and *Just One Year* brand to Target, increased $1.3 million, or 1.9% to $67.6 million. This increase was driven by a 6.5% increase in sales of our *Just One Year* brand, or $1.5 million. Sales from our *Child of Mine* brand were comparable to the third quarter of fiscal 2006.

Consolidated retail store sales increased 5.8% to $165.2 million. Carter's retail store sales increased 9.6% to $102.4 million, driven by sales of $5.4 million from new stores and a comparable store sales increase of $3.8 million, or 4.1%. OshKosh retail store sales of $62.8 million were comparable to last year and included $3.3 million of sales from new stores, partially offset by a comparable store sales decrease of $3.1 million, or 5.0%.

In the third quarter of fiscal 2007, the Company opened one Carter's retail store and three OshKosh retail stores. As of September 29, 2007, the Company had 222 Carter's and 162 OshKosh retail stores. In the fourth quarter, the Company plans to open seven Carter's and three OshKosh retail stores resulting in a total of ten store openings for Carter's and eight store openings for OshKosh in fiscal 2007.

For the third quarter of fiscal 2007, the Company's net income was $34.6 million, or $0.58 per diluted share, compared to net income of $35.0 million, or $0.57 per diluted share, in the third quarter of fiscal 2006.

"Despite a very challenging retail environment, our results for the third quarter were consistent with our expectations," noted Fred Rowan, Chairman and CEO. "We expect the market will continue to

be difficult given the macroeconomic concerns impacting consumers. Accordingly, we continue to have a cautious outlook for the balance of the year.

"We're fortunate to own two of the strongest brands in young children's apparel, marketed to the best performing retailers in the country," added Mr. Rowan. "We believe our multiple brand and channel growth strategies, together with the significant investments made in 2007 in talent, product competitiveness, branding, and consumer research, will enable us to deliver better performance for our shareholders in 2008."

45.    On October 29, 2007, Carter's filed a Form 10-Q with the SEC for the third fiscal quarter of 2007.  This Form 10-Q was signed by Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on October 23, 2007.

46.    On February 26, 2008, Carter's issued a press release entitled "Carter's, Inc. Reports Fourth Quarter and Fiscal 2007 Results," which stated in relevant part:

Consolidated net sales increased 4.2% to $393.4 million.  Net sales of the Company's Carter's brands increased 4.0% to $294.0 million.  Net sales of the Company's OshKosh brand increased 4.8% to $99.4 million.

Consolidated retail store sales increased 9.6% to $189.0 million.  Carter's retail store sales increased 13.8% to $112.8 million, driven by a comparable store sales increase of $8.5 million, or 8.9%, and sales of $5.4 million from new stores.  OshKosh retail store sales increased 3.9% to $76.2 million, driven by sales of $5.1 million from

new stores, partially offset by a comparable store sales decrease of $2.2 million, or 3.0%.

In the fourth quarter of fiscal 2007, the Company opened seven Carter's and four OshKosh retail stores. The Company also closed one Carter's and three OshKosh retail stores. As of December 29, 2007, the Company had 228 Carter's and 163 OshKosh retail stores.

The Company's mass channel sales, which are comprised of sales of its *Child of Mine* brand to Wal-Mart and *Just One Year* brand to Target, increased 11.8% to $54.8 million. This increase was driven by a $4.7 million, or 20.4%, increase in sales of our *Just One Year* brand and a $1.1 million, or 4.2%, increase in sales of our *Child of Mine* brand.

The Company's wholesale sales decreased 4.1% to $149.6 million. Carter's wholesale sales decreased 6.0% to $126.5 million. OshKosh wholesale sales increased 7.7% to $23.1 million.

In the fourth quarter of fiscal 2007, net income increased 4.2%, or $1.2 million, to $28.6 million, or $0.48 per diluted share, compared to net income of $27.4 million, or $0.45 per diluted share, in the fourth quarter of fiscal 2006.

Included in fourth quarter fiscal 2007 earnings is a $2.4 million benefit from reversing previously recorded charges for certain performance-based stock awards. In the fourth quarter of fiscal 2007, the Company determined that the performance objectives for these stock awards would not likely be achieved. Excluding the benefit from reversing these expenses, adjusted net income for the fourth quarter of fiscal 2007 decreased $0.5 million to $26.9 million, or $0.45 per diluted share. The reconciliation of income as reported under accounting principles generally accepted in the United States of America ("GAAP") to income adjusted for the benefit from reversing certain stock-based compensation expenses is shown below.

...

41

47.    On February 27, 2008, Carter's filed its Annual Report with the SEC on Form 10-K for the fourth fiscal quarter of 2007 and the 2007 fiscal year. This Form 10-K was signed by, among others, Defendants Rowan and Casey and reaffirmed the Company's financial results previously announced on February 26, 2008.

48.    On April 22, 2008, Carter's issued a press release entitled "Carter's, Inc. Reports First Quarter Results," which stated in relevant part:

> Consolidated net sales increased 3.1% to $330.0 million. Net sales of the Company's Carter's brands increased 7.2% to $267.2 million. Net sales of the Company's OshKosh brand decreased 11.3% to $62.8 million.
>
> Consolidated retail store sales increased 8.4% to $130.8 million. Carter's retail store sales increased 15.5% to $86.4 million, driven by a comparable store sales increase of 12.3%, or $9.2 million, and sales of $2.7 million from new Carter's stores opened since the first quarter of fiscal 2007. OshKosh retail store sales decreased 3.2% to $44.4 million, due to a comparable store sales decrease of 6.6%, or $3.0 million, partially offset by sales of $1.9 million from new OshKosh stores opened since the first quarter of fiscal 2007.
>
> In the first quarter of fiscal 2008, the Company opened one Carter's retail store. As of March 29, 2008, the Company had 229 Carter's stores and 163 OshKosh stores. The Company plans to open a total of 25 Carter's stores and two OshKosh stores during fiscal 2008. The Company also plans to close five Carter's stores and three OshKosh stores during fiscal 2008.
>
> The Company's wholesale sales decreased 1.0% to $136.3 million. Carter's wholesale sales increased $5.2 million, or 4.6%, to

$117.8 million, due primarily to the timing of demand. OshKosh wholesale sales decreased $6.5 million, or 26.2%, to $18.4 million.

The Company's mass channel sales, which are comprised of sales of our *Just One Year* brand to Target and *Child of Mine* brand to Wal-Mart, increased 1.8% to $62.9 million. Sales of our *Just One Year* brand increased $4.8 million, or 21.1%, to $27.5 million, while sales of our *Child of Mine* brand decreased $3.7 million, or 9.4%, to $35.4 million.

Consolidated operating income in the first quarter of fiscal 2008 decreased $0.6 million, or 2.9%, to $20.6 million compared to the first quarter of fiscal 2007. Compared to our adjusted operating income in the first quarter of fiscal 2007, which excludes facility closure costs of $6.0 million, as reconciled below, our first quarter fiscal 2008 operating income decreased $6.6 million, or 24%. This decrease was due primarily to a decline in gross margin in our OshKosh retail stores resulting from Fall and Holiday product performance, higher provisions for excess inventory, particularly in our OshKosh retail and mass channel segments, and lower margins on certain mass channel products.

Income tax expense for the first quarter of fiscal 2008 includes a benefit of $1.6 million resulting from the reversal of income tax reserves following the completion of recent tax audits.

In the first quarter of fiscal 2008, net income was $11.6 million, or $0.19 per diluted share, compared to $9.6 million, or $0.16 per diluted share, in the first quarter of fiscal 2007. Excluding facility closure costs, as reconciled below, our adjusted net income for the first quarter of fiscal 2007 was $13.3 million, or $0.22 per diluted share. Net income for the first quarter of fiscal 2008, as compared to adjusted net income for the first quarter of fiscal 2007 decreased $1.8 million, or 13.5%, and diluted earnings per share decreased 13.6%.

49.    On April 25, 2008, Carter's filed a Form 10-Q with the SEC for the

first fiscal quarter of 2005. This Form 10-Q was signed by Defendants Rowan and

43

Casey and reaffirmed the Company's financial results previously announced on April 22, 2008.

50.    On July 22, 2008, Carter's issued a press release entitled "Carter's, Inc. Reports Second Quarter Results," which stated in relevant part:

> Consolidated net sales increased 4.8% to $301.7 million. Net sales of the Company's Carter's brands increased 4.1% to $238.0 million. Net sales of the Company's OshKosh brand increased 7.7% to $63.6 million.
>
> Consolidated retail store sales increased 13.9% to $142.5 million. Carter's retail store sales increased 21.5% to $92.7 million, driven by a comparable store sales increase of 17.3%, or $13.2 million, and sales of $3.5 million from new Carter's stores opened since the second quarter of fiscal 2007. OshKosh retail store sales increased 2.0% to $49.9 million, driven by sales of $1.8 million from new OshKosh stores opened since the second quarter of fiscal 2007. Comparable OshKosh retail store sales declined 0.9%, or $0.4 million.
>
> In the second quarter of fiscal 2008, the Company opened two Carter's retail stores. As of June 28, 2008, the Company had 231 Carter's and 163 OshKosh stores. The Company plans to open a total of 25 Carter's and two OshKosh stores during fiscal 2008. The Company also plans to close five Carter's and three OshKosh stores during fiscal 2008.
>
> The Company's wholesale sales increased 4.4% to $108.1 million. Carter's wholesale sales increased $1.0 million, or 1.1%, to $94.3 million. OshKosh wholesale sales increased $3.5 million, or 34.5%, to $13.8 million, due primarily to an increase in off-price shipments in the second quarter of fiscal 2008.
>
> The Company's mass channel sales, which are comprised of sales of our *Just One Year* brand to Target and *Child of Mine* brand to Wal-

Mart, decreased 13.6% to $51.1 million. Sales of our *Just One Year* brand increased $0.5 million, or 2.3%, to $21.2 million. *Child of Mine* brand sales decreased $8.5 million, or 22.2%, to $29.9 million, due primarily to product performance.

In connection with the retirement of Frederick J. Rowan, II, Chairman and Chief Executive Officer, the Company recorded charges during the second quarter of $5.3 million, $3.1 million of which relates to severance and benefit obligations and $2.2 million relates to the vesting of Mr. Rowan's performance-based stock options.

Consolidated operating income in the second quarter of fiscal 2008 was $9.3 million as compared to a consolidated operating loss of $137.9 million in the second quarter of fiscal 2007. Excluding executive retirement charges in the second quarter of fiscal 2008 and impairment and closure costs in the second quarter of fiscal 2007, the Company's adjusted operating income decreased $3.5 million, or 19.5%. This decrease was due to *Child of Mine* product performance, higher inventory and bad debt provisions, and provisions for incentive compensation.

Net income was $2.8 million, or $0.05 per diluted share, compared to a net loss of $143.4 million, or $2.48 per diluted share, in the second quarter of fiscal 2007. Excluding executive retirement charges in the second quarter of fiscal 2008 and impairment and closure costs in the second quarter of fiscal 2007, the Company's adjusted net income decreased $1.6 million, or 20.9%, and adjusted diluted earnings per share decreased 23.1%.

"While our second quarter sales were better than expected, we will continue to take a cautious outlook for the year given the uncertainty of the current economic environment. Our business continues to produce very healthy levels of cash flow, which enables us to invest in our business," noted Mr. Casey. "As expected, OshKosh continued to negatively impact our results for the quarter. With the improvement in our product offerings and better inventory management disciplines, however, we expect to achieve improved profitability from our OshKosh retail segment in the second half of this year."

51.   On August 6, 2008, Carter's filed a Form 10-Q with the SEC for the second fiscal quarter of 2005.  This Form 10-Q was signed by, among others, Defendant Casey and reaffirmed the Company's financial results previously announced on July 22, 2008.

52.   On October 21, 2008, Carter's issued a press release entitled "Carter's, Inc. Reports Third Quarter Results," which stated in relevant part:

> "Our third quarter performance was better than expected, particularly given the challenges of the current retail environment. For the past year, we've made significant investments to strengthen our organization and product offerings, and our results reflect the benefit from these investments," noted Michael D. Casey, Chief Executive Officer. "We believe the strength of our brands and the significant value we are providing to our consumers will enable us to weather this difficult retail and economic period."

> *Third Quarter of Fiscal 2008 compared to Third Quarter of Fiscal 2007*

> Consolidated net sales increased 6.2% to $436.4 million. Net sales of the Company's Carter's brands increased 6.6% to $341.0 million. Net sales of the Company's OshKosh brand increased 4.8% to $95.4 million.

> Consolidated retail store sales increased 12.0% to $185.1 million. Carter's retail store sales increased 9.8% to $112.5 million, driven by a comparable store sales increase of 6.1%, or $6.2 million, and sales of $4.2 million from Carter's stores opened since the third quarter of fiscal 2007. OshKosh retail store sales increased 15.6% to $72.6 million, driven by a comparable store sales increase of 13.2%, or $8.2 million, and sales of $2.1 million from OshKosh stores opened since the third quarter of fiscal 2007.

In the third quarter of fiscal 2008, the Company opened three Carter's retail stores. As of September 27, 2008, the Company had 234 Carter's and 163 OshKosh stores. The Company plans to open 19 Carter's and three OshKosh stores during the fourth quarter of fiscal 2008. The Company also plans to close one Carter's store during the fourth quarter of fiscal 2008.

The Company's mass channel sales, which are comprised of sales of our *Just One Year* brand to Target and *Child of Mine* brand to Wal-Mart, increased $9.1 million, or 13.4%, to $76.7 million. Sales of our *Child of Mine* brand increased $7.6 million, or 17.9%, to $49.9 million due to the timing of product launches. Sales of our *Just One Year* brand increased $1.5 million, or 6.0%, to $26.8 million.

Carter's wholesale sales increased $1.9 million, or 1.3%, to $151.8 million due to better product performance and higher demand, partially offset by the impact of cancelled orders from high credit risk customers. OshKosh wholesale sales decreased $5.4 million, or 19.1%, to $22.8 million due to a reduction in demand resulting from past product performance. This decrease also reflects changes made to improve product performance, including reducing wholesale prices.

During the third quarter of fiscal 2008, the Company recorded a $2.6 million charge related to the write-down of the carrying value of the OshKosh distribution facility held for sale. This write-down reflects a reduction in the anticipated selling price of the property due to a deterioration in the commercial real estate market.

Consolidated operating income in the third quarter of fiscal 2008 was $57.1 million as compared to $60.0 million in the third quarter of fiscal 2007. Excluding the $2.6 million charge related to the distribution facility write-down in the third quarter of fiscal 2008 and excluding the distribution facility closure costs of $0.3 million in the third quarter of fiscal 2007, the Company's adjusted operating income decreased $0.6 million, or 0.9%. An improvement in earnings from our OshKosh retail segment was offset by provisions for excess inventory and incentive compensation.

47

For the third quarter of fiscal 2008, the Company's net income was $33.4 million, or $0.58 per diluted share, compared to net income of $34.6 million, or $0.58 per diluted share, in the third quarter of fiscal 2007. Excluding the distribution facility write-down charge in the third quarter of fiscal 2008 and excluding the $0.2 million in after-tax distribution facility closure costs in the third quarter of fiscal 2007, the Company's adjusted net income increased $0.2 million, or 0.7%, and adjusted diluted earnings per share increased 3.4% to $0.60 per diluted share.

53.    On October 30, 2008, Carter's filed a Form 10-Q with the SEC for the third fiscal quarter of 2008.  This Form 10-Q was signed by, among others, Defendant Casey and reaffirmed the Company's financial results previously announced on October 21, 2008.

54.    On February 24, 2009, Carter's issued a press release entitled "Carter's, Inc. Reports Fourth Quarter and Fiscal 2008 Results," which stated in relevant part:

> "We are very encouraged by our fourth quarter performance, particularly given the significant slowdown in consumer spending and the negative macro-economic environment. It is clear that the Carter's and OshKosh brands continue to resonate with consumers," said Michael D. Casey, Chief Executive Officer. "While we are cautious in our outlook, we believe the investments we've made in product benefits, brand presentation, and our retail store operations will strengthen our overall market position and profitability."
>
> *Fourth Quarter Highlights*
>
> Consolidated net sales increased 7.3% to $422.0 million.  Net sales of the Company's Carter's brands increased 9.0% to $320.4 million.  Net

sales of the Company's OshKosh brand increased 2.2% to $101.6 million.

Consolidated retail store sales increased 12.8% to $213.2 million. Carter's retail store sales increased 16.1% to $130.9 million. Comparable store sales in Carter's stores increased 4.1%. OshKosh retail store sales increased 8.0% to $82.3 million with comparable store sales increasing 3.6%.

In the fourth quarter of fiscal 2008, the Company opened 19 Carter's and three OshKosh retail stores and closed one OshKosh retail store. As of January 3, 2009, the Company operated 253 Carter's and 165 OshKosh retail stores.

The Company's mass channel sales, which are comprised of sales of its *Child of Mine* brand to Wal-Mart and *Just One Year* brand to Target, increased 16.4% to $63.8 million. Sales of the *Just One Year* brand increased 29.3% to $35.7 million driven primarily by timing of product launches. Sales of the *Child of Mine* brand increased 3.3% to $28.0 million.

Carter's wholesale sales decreased 0.6% to $125.7 million due primarily to the impact of customer bankruptcies. OshKosh wholesale sales decreased 16.8% to $19.3 million due to lower demand, which we attribute to poor over-the-counter selling in fiscal 2007.

Reported consolidated operating income in the fourth quarter of fiscal 2008 was $48.6 million, a decrease of 4.1% from $50.7 million in the fourth quarter of fiscal 2007. Excluding the item in the previous year, which is detailed on page 11, adjusted operating income increased 1.2% to $48.6 million, driven by improvements in earnings from the Carter's and OshKosh retail segments and growth in earnings in the mass channel and OshKosh wholesale segments. The benefit of these improvements was partially offset by a decrease in earnings in the Carter's wholesale segment due to lower margins on off-price sales and product mix.

Reported net income decreased 4.4% to $27.3 million, or $0.47 per diluted share, compared to $28.6 million, or $0.48 per diluted share, in the fourth quarter of fiscal 2007. Excluding the item in the previous year, which is detailed on page 11, adjusted net income for the fourth quarter of fiscal 2008 increased 1.6%. Adjusted diluted earnings per share increased $0.02 per diluted share, or 4.4%.

A reconciliation of income as reported under accounting principles generally accepted in the United States of America ("GAAP") to income adjusted for certain items is provided on page 11.

*Fiscal 2008 Highlights*

Consolidated net sales increased 5.5% to $1.5 billion. Net sales of the Company's Carter's brands increased 6.8% to $1.2 billion. Net sales of the Company's OshKosh brand increased 1.0% to $323.4 million.

Consolidated retail store sales increased 11.9% to $671.6 million. Carter's retail store sales increased 15.3% to $422.4 million. Comparable store sales in Carter's stores increased 9.0% in fiscal 2008. OshKosh retail store sales increased 6.6% to $249.1 million with comparable store sales in fiscal 2008 increasing 3.2%. In fiscal 2008, the Company opened 25 Carter's and three OshKosh retail stores and closed one OshKosh retail store.

The Company's mass channel sales increased 4.6% to $254.4 million. Sales of the *Just One Year* brand increased 15.5% to $111.2 million, driven primarily by new door growth and additional floor space. Sales of the *Child of Mine* brand decreased 2.5% to $143.3 million, as a result of product performance in certain categories.

Carter's wholesale sales increased 1.5% to $489.7 million due to higher demand, partially offset by the impact of customer bankruptcies.

OshKosh wholesale sales decreased 14.2% to $74.3 million due to lower demand, which we attribute to poor over-the-counter selling in

fiscal 2007 and a reduction in wholesale prices. The Company lowered prices beginning in fiscal 2008 to reposition the *OshKosh* brand to appeal to a broader consumer population. The new pricing strategy led to improved over-the-counter performance, particularly in the second half of fiscal 2008.

In connection with the retirement of an executive officer, the Company recorded charges during the second quarter of fiscal 2008 of $5.3 million, $3.1 million of which related to severance and benefit obligations, and $2.2 million of which related to the vesting of stock options.

During the third quarter of fiscal 2008, the Company recorded a $2.6 million charge related to the write-down of the carrying value of the OshKosh distribution facility held for sale. This write-down reflects a reduction in the anticipated selling price of the property due to the softening of the commercial real estate market.

Reported consolidated operating income for fiscal 2008 was $135.5 million compared to a reported operating loss of $6.0 million in fiscal 2007. Excluding the impact of certain items in both years, which are detailed on page 12, adjusted operating income decreased $10.2 million, or 6.6%. The decrease in operating income resulted primarily from lower profitability in the wholesale and mass channel segments and provisions for incentive compensation, partially offset by higher earnings in the retail segments.

In fiscal 2008, reported net income was $75.1 million, or $1.29 per diluted share, compared to a reported net loss of $70.6 million, or $1.22 per diluted share, in fiscal 2007. Excluding the impact of certain items in both years, which are detailed on page 12, adjusted net income decreased $2.8 million, or 3.4%. Adjusted diluted earnings per share was comparable to last year at $1.37 per diluted share.

A reconciliation of income (loss) as reported under GAAP to income adjusted for certain items is provided on page 12.

In connection with the Company's $100 million share repurchase program, during fiscal 2008, the Company repurchased 2.1 million shares of its common stock for approximately $33.6 million at an average price of $15.82 per share. To date, under the program, the Company has repurchased 4.6 million shares for approximately $91.1 million at an average price of $19.81 per share.

Fiscal 2008 net cash provided by operating activities increased $131.6 million over fiscal 2007, driven primarily by improved working capital management.

55.     On February 27, 2009, Carter's filed its Annual Report with the SEC on Form 10-K for the fourth fiscal quarter of 2008 and the 2008 fiscal year. This Form 10-K was signed by, among others, Defendant Casey and reaffirmed the Company's financial results previously announced on February 24, 2006.

56.     On April 28, 2009, Carter's issued a press release entitled "Carter's, Inc. Reports First Quarter Results," which stated in relevant part:

"The trends in our business continue to be favorable, despite a very difficult retail market," said Michael D. Casey, Chief Executive Officer. "In this economy, consumers are more cautious with their spending, and we believe that the compelling value and nature of our product offerings, combined with the investments we have made in product benefits, brand presentation, and retail store operations, give us a competitive advantage.

"In addition, we have recently taken steps to improve our cost structure in order to stay ahead of the risks inherent in this economy," continued Mr. Casey. "We are committed to improving the profitability of the Company and believe these actions will contribute meaningfully to our long-term growth objectives."

First Quarter Highlights

Consolidated net sales increased 8.1% to $356.8 million. Net sales of the Company's Carter's brands increased 6.1% to $283.6 million. Net sales of the Company's OshKosh brand increased 16.6% to $73.2 million.

Consolidated retail sales increased 17.6% to $153.8 million. Carter's retail segment sales increased 18.0% to $101.9 million, with comparable store sales increasing 5.2%. OshKosh retail segment sales increased 16.8% to $51.8 million, with comparable store sales increasing 11.1%. Consolidated retail operating income increased $11.5 million to $16.3 million. Increased sales, improved gross margin, and improved inventory management contributed to the growth in earnings.

In the first quarter of fiscal 2009, the Company opened seven Carter's retail stores. As of the end of the first quarter, the Company operated 260 Carter's and 165 OshKosh retail stores.

Carter's wholesale sales increased 4.3% to $122.9 million due to strong product sell-through performance. OshKosh wholesale sales increased 15.9% to $21.4 million due to timing of shipments.

The Company's mass channel sales, which are comprised of sales of its *Child of Mine* brand to Walmart and *Just One Year* brand to Target, decreased 6.6% to $58.7 million due to timing of shipments.

The Company has announced a restructuring initiative comprised of a net reduction of its corporate workforce of approximately 10%, including the closure of its Oshkosh, Wisconsin facility; the closure of one of the Company's three distributions centers; and a program to improve the efficiency of retail store labor and benefits expenses. The Company has also reduced discretionary spending, including implementing a wage freeze and suspending the Company's matching contribution to its 401(k) plan.

As a result of the workforce reduction and distribution facility closure, the Company has recorded pre-tax charges of approximately $8.7 million related to severance, asset impairment, accelerated depreciation, and other closure costs. The Company expects to incur approximately $2.0 million of additional severance and accelerated depreciation charges in the second quarter of fiscal 2009. The Company expects to incur approximately $4.0 million of expenses throughout the balance of 2009 related to recruiting, relocation, and retention costs in order to consolidate certain functions currently managed in the Company's Oshkosh, Wisconsin facility into the Company's other corporate offices. Pre-tax annual savings resulting from the Company's restructuring activities are expected to be approximately $10.0 million.

Reported operating income in the first quarter of fiscal 2009 was $28.6 million, an increase of 39.0% from $20.6 million in the first quarter of fiscal 2008. Excluding the effect of certain items in the current year, which are detailed at the end of this release, adjusted operating income increased 81.5% to $37.3 million, driven primarily by growth in earnings from the Carter's and OshKosh retail segments.

Reported net income increased 41.6% to $16.4 million, or $0.28 per diluted share, compared to $11.6 million, or $0.19 per diluted share, in the first quarter of fiscal 2008. Excluding the effect of certain items in the current year, which are detailed at the end of this release, adjusted net income for the first quarter of fiscal 2009 increased 89.2%, and adjusted diluted earnings per share increased 100% to $0.38 per diluted share.

A reconciliation of income as reported under accounting principles generally accepted in the United States of America ("GAAP") to income adjusted for certain items is provided at the end of this release.

Cash flow from operations in the first quarter increased $4.4 million over the first quarter of fiscal 2008 due primarily to increased earnings.

57.   On April 30, 2009, Carter's filed a Form 10-Q with the SEC for the first fiscal quarter of 2009. This Form 10-Q was signed by Defendants Casey and Westenberger and reaffirmed the Company's financial results previously announced on April 28, 2009.

58.   On July 28, 2009, Carter's issued a press release entitled "Carter's, Inc. Reports Second Quarter Results," which stated in relevant part:

> "We are very pleased with our performance in the second quarter, which was driven by the strength of our product offerings and very good execution of our inventory management and cost reduction initiatives," said Michael D. Casey, Chief Executive Officer. "Our outlook for the year has improved based on our first half performance and the growth we anticipate in the second half of the year. We believe we're well positioned to deliver strong performance in this difficult retail marketplace given the compelling design and value of our Carter's and OshKosh B'Gosh products."
>
> Second Quarter of Fiscal 2009 compared to Second Quarter of Fiscal 2008
>
> Consolidated net sales increased 5.4% to $317.9 million. Net sales of the Company's Carter's brands increased 6.9% to $254.4 million. Net sales of the Company's OshKosh B'Gosh brand decreased 0.3% to $63.5 million.
>
> Consolidated retail sales increased 13.9% to $162.3 million. Carter's retail segment sales increased 18.9% to $110.1 million, with comparable store sales increasing 8.1%. OshKosh retail segment sales increased 4.6% to $52.2 million, with comparable store sales increasing 2.6%. Consolidated retail operating income increased $9.6 million to $17.4 million, driven primarily by Carter's retail sales growth and OshKosh retail gross margin improvement.

In the second quarter of fiscal 2009, the Company opened 11 Carter's and three OshKosh retail stores. As of the end of the second quarter of fiscal 2009, the Company operated 271 Carter's and 168 OshKosh retail stores.

Carter's wholesale sales increased $5.8 million, or 6.1%, to $100.1 million due to increased product demand. OshKosh wholesale sales decreased $2.4 million, or 17.7%, to $11.3 million due to timing of shipments, which were heavier in the first quarter.

The Company's mass channel sales, which are comprised of sales of its *Child of Mine* brand to Walmart and *Just One Year* brand to Target, decreased 13.4% to $44.2 million due largely to strategic merchandising assortment changes made by Walmart.

In connection with a previously announced workforce reduction and distribution facility closure, the Company recorded pre-tax charges of approximately $2.9 million related to severance and other benefits and accelerated depreciation in the second quarter of fiscal 2009. Also during the second quarter of fiscal 2009, the Company reduced the carrying value of its White House, Tennessee distribution facility held for sale by $0.7 million.

In connection with the retirement of an executive officer, the Company recorded charges of $5.3 million in the second quarter of fiscal 2008.

Operating income in the second quarter of fiscal 2009 was $20.9 million, an increase of $11.7 million, or 126.3%, from $9.3 million in the second quarter of fiscal 2008. Excluding the effect of certain items, which are detailed at the end of this release, adjusted operating income increased $10.0 million, or 68.5%, to $24.5 million from $14.6 million in the second quarter of fiscal 2008, driven largely by growth in earnings from its Carter's retail segment as well as improved performance of its OshKosh retail and wholesale segments.

Net income increased $8.6 million to $11.3 million, or $0.19 per diluted share, compared to $2.8 million, or $0.05 per diluted share, in the second quarter of fiscal 2008. Excluding the effect of certain items, which are detailed at the end of this release, adjusted net income increased $7.5 million to $13.6 million, or $0.23 per adjusted diluted earnings per share, compared to $6.1 million, or $0.10 per adjusted diluted earnings per share in the second quarter of fiscal 2008.

A reconciliation of income as reported under accounting principles generally accepted in the United States of America ("GAAP") to income adjusted for certain items is provided at the end of this release.

59.    On July 31, 2009, Carter's filed a Form 10-Q with the SEC for the second fiscal quarter of 2009. This Form 10-Q was signed by Defendants Casey and Westenberger and reaffirmed the Company's financial results previously announced on July 28, 2009.

60.    The above statements were materially false and misleading because Defendants misrepresented or failed to disclose that: (a) the Company had reported certain margin support payments to major wholesale customers in incorrect periods; (b) as a result, the Company's financial results were overstated during the Class Period; (c) the Company had failed to properly recognize revenue in violation of GAAP; (d) the Company lacked adequate internal and financial controls; and (e) that, as a result of the above, the Company's financial statements during the Class Period were materially false and misleading at all relevant times.

## THE TRUTH COMES TO LIGHT

61.    On October 27, 2009, Carter's issued a press release entitled "Carter's,

Inc. Delays Reporting Third Quarter Earnings Results," which stated in relevant

part:

> Carter's, Inc. (NYSE:CRI), today announced that it will delay its
> earnings release previously scheduled for this evening and its related
> investor conference call scheduled for Wednesday, October 28, 2009.
> The Company is delaying its earnings release in order to complete a
> review of its accounting for margin support to its wholesale
> customers. A matter arose late in the Company's preparation for its
> scheduled earnings release, and more time is required to fully evaluate
> this matter. The Company anticipates that it will complete its review
> and report its third quarter earnings by November 12, 2009.

62.    On this news, shares of Carter's fell $6.78 per share, or 23.8%, to

close on October 27, 2009, at $21.66 per share, on unusually heavy trading

volume.

63.    On November 10, 2009, Carter's issued a press release entitled

"Carter's, Inc. Announces Restatement of Financial Statements," which stated in

relevant part:

> Carter's, Inc. (NYSE: CRI) today announced that it will restate its
> financial statements for certain prior periods and, as a result, that it
> does not expect to timely file its quarterly report on Form 10-Q for the
> period ended October 3, 2009.
>
> On October 27, 2009, the Company announced that it was conducting
> a review of its accounting for margin support provided to its

58

wholesale customers. As a result of a disputed amount of margin support with respect to a wholesale customer, management initiated a review of previous margin support payments to this customer. Following a briefing on this issue by management, the Company's audit committee, with the assistance of outside counsel, began a review of accommodation payments more broadly. This review and related investigation are in process.

As a result of this review, management concluded that the previously issued consolidated financial statements for the fiscal years 2004 through 2008, and the fiscal quarters from September 29, 2007 through July 4, 2009, should be restated. Additional details are included in an 8-K filed by the Company today with the Securities and Exchange Commission.

"We intend to file our restated financial statements and third quarter 10-Q with the SEC as soon as possible following the completion of this review," said Michael D. Casey, Chairman and Chief Executive Officer. "We've initiated a dialogue with the SEC and informed them of this review. In addition, we are improving internal controls and management processes to help reduce risks inherent in this component of our business going forward."

64.     On the same day, the Company elaborated on these accounting issues

further in a Form 8-K filed with the SEC and stated in relevant part:

On October 27, 2009, the Company announced it was conducting a review of its accounting for margin support provided to its wholesale customers. In the normal course of business, the Company provides margin support to its major wholesale customers to assist these customers with inventory clearance and promotions. The Company's policy is to reflect the amounts of these margin support payments as reductions to revenue.

As a result of becoming aware of a disputed amount of margin support with respect to a wholesale customer, management recently initiated a review of previous margin support payments to this

customer. This review identified issues with respect to the timing of recognizing such margin support payments and the associated historical accounting treatment as a result of margin support commitments that were not disclosed to the Company's finance group.

Following a briefing on this issue by management, the Company's audit committee, with the assistance of outside counsel, began a review of margin support payments more broadly and an investigation into such undisclosed margin support commitments and related matters. The review and investigation remain in process.

As a result of this review, on November 6, 2009, management concluded that the previously issued consolidated financial statements for the fiscal years 2004 through 2008 included in the Company's most recently filed Form 10-K, and the fiscal quarters from September 29, 2007 through July 4, 2009 included in the Company's Forms 10-Q, should no longer be relied upon and, accordingly, should be restated. This conclusion resulted from management's determination that the Company had reported certain margin support payments in incorrect periods. As the investigation is on-going, additional adjustments may be needed.

The Company intends to file with the Securities and Exchange Commission the financial statements required to be restated, as well as its Form 10-Q for the quarter ended October 3, 2009, as soon as practicable once final conclusions are reached regarding the impact of the review. The Company does not expect that such conclusions will be reached until after the Form 10-Q for the quarter ended October 3, 2009 is required to be filed, and, as such, a timely filing likely will not be made.

In concluding that the Company needs to restate prior period financial statements, management has identified control deficiencies associated with its wholesale margin support payments that constitute a material weakness. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material

misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

65.    On this news, Carter's sank to a low of $20.32 before closing at $21.86 on November 10, 2009 on heavy volume, representing a 36% drop from the stock's Class Period high of $34.35 per share on April 21, 2006.

## DEFENDANTS' FAILURE TO REVEAL THE TRUTH

66.    Carter's statements and filings during the Class Period were materially false and misleading because they misrepresented or failed to disclose that : (a) Company had reported certain margin support payments to major wholesale customers in incorrect periods; (b) as a result, the Company's financial results were overstated during the Class Period; (c) the Company had failed to properly recognize revenue in violation of GAAP; (d) the Company lacked adequate internal and financial controls; and (e) that, as a result of the above, the Company's financial statements during the Class Period were materially false and misleading at all relevant times.

67.    The market for Carter's securities was an open, well-developed and efficient market at all relevant times. As a result of the materially false and misleading statements and failures to disclose described herein, Carter's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Carter's securities relying

upon the integrity of the market price of Carter's securities and market information related to Carter's, and have been damaged thereby.

68.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Carter's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse nonpublic information and misrepresented the truth about the Company, its business and operations, as alleged herein.

69.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Carter's business, prospects and operations.

70.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Carter's and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' false and

misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

71.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

72.    As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Carter's, their control over, receipt and/or modification of Carter's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Carter's, participated in the fraudulent scheme alleged herein.

73.    The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without

the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons and entities who purchased shares of Carter's during the Class Period.  Excluded from the class are Defendants herein, officers and directors of the Company, members of their immediate families and their legal representatives, and the heirs, successors or assigns of any of the foregoing.

75.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, millions of Carter's shares were traded publicly during the Class Period on the NYSE and as of July 30, 2009, Carter's had 56,784,758 shares of common stock outstanding.

76.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no interests which are contrary to, or in conflict with, the interests of the Class members that he seeks to represent.  Plaintiff has retained competent counsel, experienced in class action litigation under the federal

securities laws to ensure such protection, and intends to prosecute this action vigorously.

77.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

78.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether Defendants' publicly disseminated releases and statements during the Class Period, omitted and/or misrepresented material facts, and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

c. whether Defendants participated in and pursued the common course of conduct complained of herein;

d. whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

e. whether the market price of the Company's publicly traded securities was artificially inflated during the Class Period due to the non-disclosures and/or material misrepresentations complained of herein; and

f. whether the Class members have suffered damages and, if so, what is the proper measure of damages.

79.    Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

## SCIENTER ALLEGATIONS

80.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of dissemination of such statements or documents as primary violations of the federal securities laws.

As set forth elsewhere herein, defendants, by virtue of their receipt of information reflecting the true facts regarding Carter's, their control over, and/or receipt and/or modification of, Carter's materially misleading misstatements and omissions and/or their associations with the Company which made them privy to confidential proprietary information concerning Carter's, participated in the fraudulent scheme alleged herein.

81.    The Individual Defendants were motivated to commit the fraudulent scheme in order to reap significant personal profits. Individual Defendants Pulver and Wetzel sold substantial amounts of their shareholdings during the Class Period, while the Company's accounting issues were concealed and Carter's earnings were inflated.

| Date | Director/Officer | Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|---|
| 21 Oct 2009 | David Pulver | 14,000 | $29.00 | $406,000 |
| 20 Oct 2009 | David Pulver | 4,200 | $29.00 | $121,800 |
| 19 Oct 2009 | David Pulver | 6,800 | $29.00 | $197,200 |
| 11 Oct 2009 | David Pulver | 25,000 | $28.00 | $700,000 |
| 11 Oct 2009 | Charles Wetzel | 10,000 | $27.97 | $279,700 |
| 4 Oct 2009 | Charles Wetzel | 20,000 | $26.25 | $525,000 |
| 30 Sep 2009 | Charles Wetzel | 20,000 | $26.13 | $522,600 |

| | | | | |
|---|---|---|---|---|
| 20 Sep 2009 | David Pulver | 22,182 | $27.00 | $598,914 |
| 13 Sep 2009 | Charles Wetzel | 10,000 | $25.36 | $253,600 |
| 7 Sep 2009 | Charles Wetzel | 20,000 | $25.28 | $505,600 |
| 31 Aug 2009 | Charles Wetzel | 20,000 | $24.95 | $499,000 |
| 13 May 2009 | Charles Wetzel | 13,020 | $21.05 | $274,071 |
| 3 May 2009 | David Pulver | 125,000 | $22.93 | $2,866,250 |

Source: http://www.reuters.com/finance/stocks/insiderTrading?symbol=CRI

82.    Each of these Defendants sold his stock while in possession of material adverse non-public information concerning Carter's, namely, the Company's improper accounting that inflated Carter's earnings. Accordingly, the facts alleged herein compel a strong inference, that is cogent and at least as compelling as any opposing inference of nonfraudulent intent, that Defendants made materially false and misleading statements to the investing public with scienter.

### **NO SAFE HARBOR**

83.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not

identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Carter's who knew that those statements were false when made.

## LOSS CAUSATION

84.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

85.    During the Class Period, Plaintiff and the Class purchased Carter's securities at artificially inflated prices and were damaged thereby.  The price of Carter's securities significantly declined when the misrepresentations made it to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## RELIANCE ALLEGATIONS
## FRAUD ON THE MARKET DOCTRINE

86.     At all relevant times, the market for Carter's securities was on an efficient market for the following reasons, among others:

        i.     At all relevant times during the Class Period, shares of Carter's were listed and actively traded on the NYSE, a highly efficient national market.

        ii.    As a registered and regulated issuer of securities, Carter's filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this complaint.

        iii.   Numerous financial analysts followed the Company's stock. Thus, the Company's stock reflected the effect of information disseminated in the market.

87.     As a result of the above, the market for Carter's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' prices. Under these circumstances, all purchasers of Carter's securities during the Class Period suffered similar injury through their purchase of securities at prices which were artificially inflated by defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## CLAIMS FOR RELIEF

## COUNT I

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

88.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

89.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.

90.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

      i.    employed devices, schemes and artifices to defraud;

      ii.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      iii.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in

connection with their purchases of shares in Carter's during the Class Period.

91.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for shares of Carter's. Plaintiff and the Class would not have purchased Carter's at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

92.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Carter's securities during the Class Period.

## COUNT II

### VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

93.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

94.    During the Class Period, the Individual Defendants acted as controlling persons of Carter's within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, their business expertise, their participation and/or awareness of the Company's operations, and their ownership of Carter's securities, the Individual Defendants had the power and

authority to cause Carter's to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants and Carter's are liable pursuant to §20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action, certifying Plaintiff as a Class representative pursuant to Fed. R. Civ. P. 23, and certifying his counsel as Class counsel;

B.    Awarding Plaintiff and the members of the Class damages, interest and costs;

C.    Awarding Plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2009        Respectfully submitted,

**HOLZER HOLZER & FISTEL, LLC**

Corey D. Holzer
Georgia Bar Number: 364698
Michael I. Fistel, Jr.
Georgia Bar Number: 262062
Marshall P. Dees
Georgia Bar Number: 105776
William W. Stone
Georgia Bar Number: 273907
200 Ashford Center North
Suite 300
Atlanta, Georgia 30338
Telephone: 770-392-0090
Facsimile: 770-392-0029

**FINKELSTEIN THOMPSON**

Donald J. Enright
Michael G. McLellan
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

## PLAINTIFF CERTIFICATION

I, Scott Mylroie, hereby declare that:

1.    I have reviewed a draft Complaint in this class action and have authorized the filing thereof.

2.    I did not purchase (or otherwise acquire) or sell securities of Carters, Inc., the subject of the Complaint, at the direction of counsel or in the hope to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

3.    I am willing to serve as a representative plaintiff on behalf of the class defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.    I have engaged in the following transactions involving the securities of Carter's Inc:

| Purchases | Trade Date | Price Per Security | Total |
|---|---|---|---|
| 1000 | 10/12/09 | 27.93 | 27938.95 |

| Sales | Date | Price Per Security | Total |
|---|---|---|---|
| 1000 | 10/27/09 | 22.75 | 22 740.46 |

5.    During the last three years preceding the date of this Certification, I have sought to serve as a representative plaintiff on behalf of a class in the following actions brought under the Securities Act of 1933 or the Securities Exchange Act of 1934:

6.    I will not accept any payment for serving as a representative plaintiff on behalf of the class beyond its pro rata share of any recovery, except as ordered by the Court.

7.    Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 16 day of Nov, 2009.

_____
Scott Mylroie